SCHOTT, Judge.
Plaintiff, Mrs. Peggy R. Lombardo, has appealed from a dismissal of her medical malpractice claim against Dr. Sidney D. Bullard, a gynecologist, and his insurer. Bullard was alleged to be negligent in his use of cotton sutures for a vaginal repair and in his failure to recognize that these sutures were causing serious problems for her during the post-operative period. The issues are whether the trial court erred in his factual conclusions adverse to plaintiff and whether LSA R.S. 9:2794 prescribing the standards for measuring the quality of a physician’s conduct is unconstitutional.
Plaintiff was hospitalized in May, 1973, for anterior and posterior vaginal repairs by defendant. He utilized cotton sutures in the deep fascia along with chromic absorba-ble sutures elsewhere. She remained under his care until the end of January, 1974, when she consulted another gynecologist, *296 Dr. Wiedemann. Her condition during the months while Bullard was treating her is the subject of sharply conflicting testimony by the parties.
According to plaintiff, she continued over these months to have bleeding and a malodorous discharge from her vagina as well as soreness and discomfort in the area which prompted Bullard to cauterize her vagina several times. Bullard testified that plaintiff’s recovery was generally uneventful until November, when he found a raw spot on her vagina which he cauterized with silver nitrate. He also testified that he found some additional sore spots in January, which he also cauterized, and when he saw her for the last time as a patient in late January he was considering rehospitalization which he discussed with her. Plaintiff testified that he never mentioned rehospi-talization.
The trial judge obviously rejected plaintiff’s testimony and accepted Bullard’s. For our purposes on appeal we must accept this credibility call and the facts as testified to by Bullard. For reasons discussed below this determination of whether to believe plaintiff was crucial and the rejection of her testimony was dispositive of her case based on Bullard’s alleged failure to diagnose properly during the post-operative period, but we first consider plaintiff’s charge that Bullard’s use of cotton sutures constituted negligence in the first place.
Bullard explained that cotton sutures had the advantage of being stronger and thus more desirable for anchoring the bladder and the rectum in vaginal repair work. His expert, Dr. Gauthier, another gynecologist, testified that he used cotton in thousands of such cases without a problem. None of the other experts, two called by plaintiff and one by defendant, said the use of cotton sutures constituted substandard medical conduct. They said only that they did not use cotton, preferring chromic absorbable material. The reading of this expert testimony does not furnish us with a basis to reverse the trial judge’s conclusion that plaintiff did not prove that Bullard’s use of cotton sutures of itself constituted medical malpractice.
Following his testimony that plaintiff’s recovery was generally uneventful until November 26, when he discovered a raw spot which he cauterized with silver nitrate, Bullard testified as follows: When she returned for her next visit on December 4 he found that the area previously cauterized was healing and she was instructed to return in a week. She did return on January 8, 1974, complaining of bleeding from the area. He had already considered the possibility that her trouble was being caused by the cotton sutures and checked to see if the incision was “spitting” any of the sutures. He found none but he did not probe because this would damage repairs that had already been completed. He told her to return for another examination which she did on January 28, again complaining of bleeding. The spots Bullard had discovered previously were still raw and he cauterized them with silver nitrate. He inspected for sutures and found none. He prescribed medication and told her to return in one week for evaluation and possible hospitalization.
When plaintiff was examined by Dr. Wiedemann on February 6 she complained of bleeding and a discharge. Dr. Wiede-mann found two lesions, one in the anterior area and the other in the posterior area, and he discovered two sutures extruding from the anterior repair and one from the posterior area. He removed these sutures and cauterized the area with silver nitrate. By March 1, the anterior area had healed but the posterior area had not He recommended hospitalization for a wedge resection, a procedure involving the removal from along the incision granulation tissue which contained cotton sutures. This was carried out in the hospital on March 25 with several cotton sutures being excised from the incision along with the tissue and the wound being closed with absorbable sutures.
Plaintiff next consulted a urologist for problems in her uretha. He found a stricture in the uretha which may have been the result of the cotton suture-infection-granulation tissue development on the anterior of *297 the vaginal wall. However, the urologist also stated that this condition could have resulted from chronic cystitis which Dr. Bullard testified plaintiff had even before the surgery in May (but which plaintiff denied she had) or even from placement of an indwelling catheter during the 1973 surgery. In any event, our conclusion of no manifest error in the trial judge’s conclusion that no negligence on Dr. Bullard’s part was proved makes it unnecessary to decide the cause of plaintiff’s problem.
All of the testifying gynecologists agreed essentially that there was no reason for Bullard to resort to probing and hospitalization for plaintiff unless he found that cotton sutures were in fact extruding from the incision. They all agreed that cauterization with silver nitrate was the proper treatment when the raw spot first showed up in November and that it was not unreasonable or substandard for Bullard to cauterize again in January when the two additional raw spots showed up and to consider hospitalization for the first time at the end of January.
R.S. 9:2794 prescribes that a plaintiff in a malpractice action based on the negligence of a physician has the burden of proving the following:
“(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular speciality and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.”
Accepting Bullard’s testimony as true we readily conclude that plaintiff failed to carry her burden of proof. There is no testimony by any of the experts that Bul-lard’s treatment of plaintiff was beneath the degree of care or lacking in the skill possessed by physicians practicing in the community.
Plaintiff contends that her establishing that Bullard had used cotton sutures constituted proof that he had implanted a foreign object in her with the result that hers was a res ipsa loquitur situation shifting the burden to Bullard. This argument fails because there was no proof that the use of cotton sutures in the deep fascia was not consistent with proper medical care. Plaintiff also places reliance on her testimony that when she was first examined by Dr. Wiedemann he asked her, “What butcher did this?”. This testimony was given after Dr. Wiedemann had already testified. Plaintiff contends that defendants’ failure to recall Dr. Wiedemann to determine whether he made that statement results in an inference unfavorable to defendants’ case. Considering that Dr. Wiedemann’s testimony was not critical of Bullard’s treatment it seems obvious that he would have denied making such a statement. And, further considering that plaintiff supposedly had knowledge of such a statement when she had Dr. Wiedemann on the witness stand and declined to interrogate him with respect to any such statement, we cannot conclude that the failure by defendants to recall him resulted in an unfavorable inference with respect to their case.
Finally, we turn to plaintiff’s argument that R.S. 9:2794 is unconstitutional. Plaintiff’s argument is that the statute is unconstitutionally vague because the phrase “the degree of care ordinarily executed” is not defined with specificity and because the statute makes no provision for notice as to how a plaintiff is to proceed in establishing *298 that degree of care. We are unpersuaded by this argument in support of which plaintiff cites no authority. In effect, she says the statute is vague based on her subjective interpretation. The words are clear enough for an understanding and application by the trier of fact be it judge or jury. We simply do not agree with plaintiff that the statute is vague, although the use of the words “degree of” seem superfluous. Since the language as a whole is quite clear we see no necessity for the inclusion of notice as to how plaintiff is to proceed.
Plaintiff’s next argument on unconstitutionality is that she, as a medical tort victim, has been denied the due process and equal protection afforded victims of torts in general. She concedes that other aspects of the medical malpractice act were held to pass constitutional muster in Everett v. Goldman, 359 So.2d 1256 (La.1978), but contends that the approved sections of the act do not abridge a fundamental right to a fair trial as does R.S. 9:2794.
We are not convinced that plaintiff’s fundamental right has been changed. A tort victim in general must prove that the defendant’s conduct was below the standard expected of a reasonably prudent person under the circumstances. The statute simply recognizes that the circumstances encompassing a physician’s or dentist’s conduct include the degree of care and skill possessed by the reasonably prudent physician or dentist in the community and within the speciality involved. Even before the enactment of the statute the courts recognized that the doctor’s conduct had to be evaluated according to a relevant standard, i. e., acceptable conduct within the medical profession. It would be impractical to measure the doctor’s conduct by standards which do not take into account the extent of specialized knowledge or skill available to a defendant at the time and place where his alleged tort was committed. The statute does no more than provide the trier of fact with a workable aid in the task of determining whether or not the doctor’s conduct was substandard. It does not hamper a plaintiff in search of justice but assists the court in its search for the truth in a constantly developing, technical, scientific area thereby promoting justice.
AFFIRMED.